UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                       :

UMB BANK, NATIONAL ASSOCIATION, solely in its
capacities as Senior Trustee and Security Trustee,         :             16 Civ. 7717 (PAE)
                                         :

                        Plaintiff,          :           OPINION & ORDER
                                         :

                      -v-                   :

AIRPLANES LIMITED and AIRPLANES U.S. TRUST, :
                                         :

                        Defendants.       :
                                         :
------------------------------------------------------------------ X

PAUL A. ENGELMAYER, District Judge:

        This case involves claims regarding the propriety of a large reserve of funds. Plaintiff

UMB Bank, National Association ("UMB"), in its capacity as Senior Trustee and Security

Trustee under contracts pertaining to a series of notes issued in the 1990s, claims that defendants

Airplanes Limited and Airplanes U.S. Trust (collectively, "Airplanes") are wrongfully

withholding a reserve of millions of dollars (the "Reserve") owed to Airplanes's noteholders.

        Cross-motions for judgment on the pleadings are pending. In its motion, UMB seeks a

judgment that (1) Airplanes has misclassified the Reserve and is wrongfully blocking UMB from

distributing funds in it to noteholders, (2) UMB may distribute the Reserve to noteholders, (3)

the misclassification has triggered an "event of default" under a 1996 contract (the "Indenture")

between Airplanes and the trustee of the notes, and (4) that event of default renders the Subclass

A-9 note, as well as Airplanes U.S. Trust's guarantee of that note, immediately due and payable.

*See* Dkt. 30 at 28. In its cross-motion, Airplanes seeks a judgment that the Reserve has not been

misclassified and that no event of default has occurred. Airplanes also moves for a preliminary

injunction directing UMB to stop blocking Airplanes from paying certain expenses on behalf of Airplanes and of Airplanes's subsidiaries.

For the following reasons, the Court grants UMB's motion for partial judgment on the pleadings on the issues of whether the Reserve has been misclassified and whether there has been an event of default, denies Airplanes's motion for judgment on the pleadings, and denies Airplanes's motion for a preliminary injunction.

## I.    Background[1]

### A.    Factual Background

#### 1.    The Parties

UMB is a national banking association.  FAC ¶ 14.  It is Senior Trustee under the Indenture, and Security Trustee under a 1996 Security Trust Agreement.  *Id.*

Airplanes Limited is a limited liability company that was formerly engaged in the business of acquiring, leasing, and selling aircraft.  *Id.* ¶¶ 1, 15.  As of the filing of the complaint in this action, Airplanes Limited had ceased operating and had sold all its aircraft.  *Id.* ¶¶ 1, 5, 21; Airplanes Ans. ¶ 5.  Airplanes Limited is the issuer of the notes at issue, which are described further below.  Airplanes Ans. ¶ 138.

Airplanes U.S. Trust is a Delaware business trust.  FAC ¶ 16.  The business of Airplanes U.S. Trust and its subsidiaries is "substantially identical" to that of Airplanes Limited and its subsidiaries.  *Id.* ¶ 23.  Airplanes U.S. Trust has also sold its aircraft and is no longer operating.

---

[1] The Court's account of the facts of this case is derived from the pleadings, which form the basis for the parties' pending motions.  These include UMB's First Amended Complaint, Dkt. 10 ("FAC"); Airplanes's Answer and Counterclaim, Dkt. 19 ("Airplanes Ans."); and UMB's Answer to Airplanes's Counterclaim, Dkt. 27 ("UMB Ans.").  The FAC also attaches, and incorporates, the Indenture.  Dkt. 14, Ex. A ("Indenture").

*Id.* Airplanes U.S. Trust has four controlling trustees, all of whom serve as directors of Airplanes Limited. *Id.* ¶ 16. Airplanes U.S. Trust is the guarantor of the notes at issue. *Id.*

### 2. The Notes

In or about March 1996, Airplanes Limited acquired 95% of the capital stock of Airplanes Holdings. *Id.* ¶ 20. In so doing, Airplanes Limited indirectly acquired 206 aircraft, related leases and receivables, and intercompany receivables. *Id.* Airplanes Holdings owned these aircraft directly and through subsidiaries, and leased the aircraft to lessees. *Id.* ¶ 21.

To finance the acquisition of aircraft and leasing assets and the equity ownership in Airplanes Holdings and other aircraft-owning subsidiaries, Airplanes Limited issued approximately $3.68 billion of notes guaranteed by its affiliate Airplanes U.S. Trust. *Id.* ¶¶ 1, 22. Airplanes Limited issued Class A notes, including Subclasses A-1 through A-9, Class B notes, Class C notes, and Class D notes to pass-through trusts; the pass-through trusts then issued corresponding classes and sub-classes of certificates to investors. *Id.* ¶¶ 22–23; Airplanes Ans. ¶ 140. Each certificate issued to an investor represented an interest in a specific class or subclass of notes issued by Airplanes Limited and an interest in a corresponding class or subclass of notes simultaneously issued by Airplanes U.S. Trust. FAC ¶ 23; Airplanes Ans. ¶ 140. Airplanes U.S. Trust guaranteed the notes issued by Airplanes Limited; Airplanes Limited in turn guaranteed the notes issued by Airplanes U.S. Trust. FAC ¶ 23.

Airplanes Limited used proceeds from the notes and certificates to make intercompany loans, totaling nearly $4 billion, to Airplanes Holdings and its subsidiaries. *Id.* ¶ 24.

To secure its obligations under the notes, Airplanes Limited granted the Security Trustee under the Security Trust Agreement a security interest in collateral including "(i) all funds received by Airplanes Limited or funds or any other interest held or required by the terms of the

3

Indenture to be held in any Account, (ii) all deposit accounts possessed by the Security Trustee for or on behalf of the Secured Parties, and (iii) all of Airplanes Limited's right, title and interest in and to all deposit accounts and all funds or other interests therein, including any proceeds thereof." *Id.* ¶ 92; *see id.*, Ex. D § 2.01(c), (e). The Security Trust Agreement also permitted the Security Trustee—at present, UMB Bank[2]—to exercise remedies against this collateral if an event of default occurred and a default notice, as defined by the Indenture, was delivered. *See* Airplanes Ans. ¶ 139.

Airplanes Limited has since repaid in full or refinanced the principal of the Subclass A-1 notes through the Subclass A-8 notes. FAC ¶ 26. Most recently, the Subclass A-8 notes were repaid in full in 2010. *Id.* ¶ 43. The Subclass A-9 notes, Class B notes, Class C notes, and Class D notes, however, remain outstanding. *Id.* ¶ 26.

Airplanes Limited and Airplanes Holding are both now insolvent. They have sold all of their aircraft and are no longer operating. *Id.* ¶¶ 1, 5, 21, 27.

### 3. The Transbrasil Judgment

In an agreement dated March 28, 1996, Airplanes Limited and Airplanes Holdings retained GE Capital Aviation Services ("GECAS") as a servicer with responsibilities including, *inter alia*, "negotiating, executing, and collecting rent on aircraft leases, and releasing and selling aircraft." *Id.* ¶ 28. In the 1990s, Airplanes Holdings leased two aircraft to a now-defunct Brazilian airline called Transbrasil. *Id.* ¶ 29. A number of other entities also leased aircraft to Transbrasil (with Airplanes Holdings, the "Transbrasil Lessors"). *Id.* GECAS was servicer for all of the leases entered into between the Transbrasil Lessors and Transbrasil. *Id.*

---

[2] From March 28, 1996 until September 29, 2016, UMB's predecessor, Deutsche Bank Trust Company Americas ("DBTCA"), served as Security Trustee under the Security Trust Agreement, as well as trustee under the Indenture. Airplanes Ans. ¶ 141.

Transbrasil ultimately defaulted under these leases. *Id.* ¶ 30. GECAS, on behalf of the Transbrasil Lessors, restructured Transbrasil's debt. *Id.* Under the restructuring, Transbrasil issued promissory notes to the Transbrasil Lessors. *Id.* In 2000, Transbrasil defaulted on these promissory notes. *Id.* ¶ 31.

In 2001, GECAS unsuccessfully attempted to collect against Transbrasil. *Id.* ¶ 31. GECAS purported to undertake this collection on behalf of the Transbrasil Lessors. *Id.* Shortly thereafter, Transbrasil sought an injunction and brought a lawsuit against Airplanes Holdings, seeking (1) a declaration that the promissory notes to the Transbrasil Lessors had already been paid, and (2) a financial penalty against the Transbrasil Lessors. *Id.* GECAS defended this lawsuit on behalf of Airplanes Holdings. According to Airplanes Holdings, GECAS did not inform Airplanes Holdings of the lawsuit until nearly 10 years after it was brought. *Id.* ¶ 32.

In July 2001, GE Capital—one of the Transbrasil Lessors and a GECAS affiliate—initiated involuntary bankruptcy proceedings in Brazil against Transbrasil. That bankruptcy was approved on appeal although the appellate process is, evidently, not complete. *Id.* ¶ 33.

On May 3, 2007, a Brazilian court entered a judgment that required the Transbrasil Lessors to pay Transbrasil twice the amount of the promissory notes, plus interest and damages suffered by Transbrasil in connection with GECAS's collection efforts, including lost profits and damages Transbrasil suffered as a result of the involuntary bankruptcy filing. *Id.* ¶ 35. As recounted in the FAC, the Brazilian court found that the debt had already been paid at the time that GECAS attempted to collect it, and that GECAS had attempted the collection maliciously and had litigated in bad faith. *Id.* ¶ 36.[3] A lower Brazilian court then issued two orders to pay.

---

[3] The parties dispute "whether there was bad faith conduct, and . . . whether a finding of liability in Brazil necessarily turns on that." *See* Transcript of Oral Argument ("Tr.") at 6.

*Id.* ¶ 38. Transbrasil asserted that an $80 million payment required by the orders to pay was directly attributable to Airplanes Holdings; Airplanes Limited concedes that, had the Brazilian court orders remained in force, Airplanes Holdings was potentially liable for that payment and for a separate $59 million payment. *Id.*

In October 2013, however, the Federal Court of Appeals of Brazil overturned key portions of the judgment against the Transbrasil Lessors ("the October 2013 Reversal"). *Id.* ¶¶ 40–41. Relevant here, on February 4, 2014, as a result of the October 2013 Reversal, the two orders to pay were cancelled—and remain cancelled today. *Id.* On November 23, 2016, a Brazilian court declined to entertain Transbrasil's appeal of the October 2013 Reversal. *See* Dkt. 25; Tr. at 10.

### 4. Establishment of the Reserve for Potential Liability to Transbrasil

Airplanes Limited's estimates of its potential liability following the 2007 Transbrasil judgment grew over time. On March 31, 2010, Airplanes Limited publicly disclosed the 2007 Transbrasil judgment for the first time in an annual report. It estimated potential liability at a maximum of $15 million plus interest and legal costs. FAC ¶ 44.[4] On March 31, 2011, Airplanes Limited again expressed the view that liability to Transbrasil could result in a loss of up to $15 million. At this time, the outstanding balance on the Subclass A-9 notes was $627 million. *Id.* ¶ 46.

Beginning July 16, 2012, however, Airplanes Limited suspended all required payments on the Subclass A-9 note in order to divert available funds into a "Reserve," classified as a "Maintenance Reserve," to cover Airplanes Holdings's liability to Transbrasil. *Id.* ¶ 47.

---

[4] On November 15, 2010, notwithstanding that potential liability, Airplanes Limited paid the principal balance of the Subclass A-8 notes, which at that time was $75 million. *Id.* ¶¶ 44–45.

Airplanes Limited then set a target of $110 million for the Reserve. *Id.* ¶ 48. In tension with this target, Airplanes Limited estimated in its March 31, 2012 financial statements that liability to Transbrasil could reach only $19 million. *Id.* Payments on the Subclass A-9 note remained suspended until January 15, 2013, as funds were diverted to the Reserve. *Id.*

On October 8, 2013, Airplanes Limited again suspended payments on the Subclass A-9 note so as to increase the Reserve to a new target of $140 million. *Id.* ¶ 49. Two weeks later came the October 2013 Reversal, which led to the cancellation of the orders to pay. *Id.* ¶ 50. Airplanes Limited did not, however, distribute the Reserve to noteholders, or reduce the Reserve. It continued to suspend payments on the Subclass A-9 note until December 15, 2014. *Id.* ¶ 49.

On November 16, 2015, Airplanes Limited again suspended payments on the A-9 note so as to enable the Reserve to grow to a new target of $190 million. *Id.* ¶ 51. Payments on the Subclass A-9 note have remained suspended ever since. *Id.*[5]

As of the date of the filing of the FAC, the Reserve contained more than $190 million. *Id.* ¶ 1.

### 5. Reclassification of the Reserve

As noted, when Airplanes Limited established the Reserve, it initially classified the Reserve as a portion of a "Maintenance Reserve Amount" under the Indenture. *Id.* ¶ 55; *see id.*, Ex. A ("Indenture") § 1.01. Under the Indenture provision that governs the priority of payments and requires Airplanes Limited to use available funds to make monthly payments against the outstanding principal of the notes, *id.* § 3.08, the Maintenance Reserve Amount is one of a few

---

[5] UMB also alleges that, in addition to maintaining what it claims is an excessive Reserve, Airplanes Limited continues to incur and cause the payment of excessive administrative costs, fees and expenses. *Id.* ¶ 79. These include a payment of a monthly "Administrative Agent" fee of nearly $290,000 and a payment of a monthly "Cash Manager" fee of approximately $110,000.

classifications of funds that rank ahead of required payments on the Subclass A-9 note, *id.* ¶¶ 43, 55; *see* Indenture § 3.08(a)(iii).[6] The Maintenance Reserve Amount was intended, according to the FAC, to cover certain expenses associated with aircraft maintenance. FAC ¶ 56. On May 6, 2016, however, Airplanes sold its final aircraft; the Indenture then required the Maintenance Reserve Amount to be zero (because nonexistent aircraft cannot need maintenance). *Id.* ¶ 57.

As a result, after May 6, 2016, Airplanes Limited reclassified the Reserve as part of the "Required Expense Amount" under the Indenture. *Id.* ¶ 58; *see* Indenture § 3.01(d). The "Required Expense Amount" is another classification that takes priority over payments on the Subclass A-9 notes. Indenture § 1.01; *see* FAC at ¶ 58.

The Indenture defines the Required Expense Amount as containing:

(i) the amount of Expenses of Airplanes Group due and payable on the Calculation Date relating to such Payment Date or reasonably anticipated to become due and payable before the end of the Interest Accrual Period beginning on such date,

(ii) at the discretion of the Cash Manager, an amount necessary to provide for Permitted Accruals . . . and

(iii) an amount determined by the Cash Manager to be necessary to maintain the Permitted Balance in the Expense Account after payment of the Expenses (on such Payment Date and during the next succeeding Interest Accrual Period) and provision for the Permitted Accruals.

Indenture § 1.01. The Indenture defines a Permitted Accrual as a "balance containing accruals in respect of Expenses that are not regular, monthly recurring Expenses . . . of Airplanes Group anticipated to become due and payable in any future Interest Accrual Period." Indenture

---

[6] Offering documents issued in connection with the Subclass A-9 certificates—a confidential offering memorandum dated March 8, 2001 and a publicly-filed prospectus dated April 26, 2001—disclosed to potential investors that, under the Indenture, certain expenses and claims on Airplanes's subsidiaries would take priority over payments to noteholders. Airplanes Ans. ¶¶ 149-51.

§ 3.01(d). The Indenture defines an "Expense" as "any fees, costs or expenses incurred by an Airplanes Group Member in the course of the business activities permitted under Section 5.02(e) of the Indenture." *Id.* § 1.01.

### 6. Proposed Reduction of the Reserve

On April 7, 2017, two months after argument on the pending motions in this case, including UMB's motion to release the funds reflecting the Transbrasil judgment from the Reserve, Airplanes filed a letter, Dkt. 66 (the "April 7 Letter"), stating that, after reviewing decisions of Brazilian courts and a recent clarification motion by Transbrasil, and after consulting Brazilian counsel, Airplanes had determined that a reduction of the Reserve would be appropriate because Airplanes no longer anticipated incurring "worst-case scenario" liability to Transbrasil, *id.* at 2. Airplanes stated that it had "proposed" to its cash manager a reduction of the Reserve from $190 million to $46 million. *Id.* Of the proposed reduced amount, Airplanes stated as follows:

> Less than $9 million of [the $46 million] is in respect of elements of [Airplanes] Holdings' defense costs and contingent liability arising from the Transbrasil Litigation that, in the view of Airplanes . . . , are still "anticipated" within the meaning of section 3.01(d)(ii) of the Indentures, on the assumption that the October 2013 Decision remains unaltered on appeal. The reduced Reserve will also include a $10 million permitted Balance, pursuant to section 3.01(d)(i) of the Indentures, in respect of expenses that are not "anticipated" within the meaning of the indentures.

*Id.* The April 7 Letter did not explain Airplanes's justification for holding in the proposed reduced Reserve the approximately $27 remainder of the $46 million (*i.e.*, the sum that was not the $9 million and $10 million addressed in the letter). In a later letter filed April 12, 2017, Dkt. 69 (the "April 12 Letter"), Airplanes stated that the Reserve would also contain funds to cover

certain expenses unrelated to the Transbrasil litigation. The April 12 Letter, however, did not specify these expenses by amount. *Id.* at 3.[7]

## B. Procedural History

On October 3, 2016, UMB filed the initial complaint. Dkt. 1. On October 31, 2016, UMB filed the FAC, seeking a judgment that the Reserve had been misclassified and should be distributed to the Subclass A-9 noteholders or, in the alternative, to the extent that the Court determined that some Reserve is appropriate, a judgment that the amount of the Reserve is unreasonable and must be reduced. Dkt. 10.

On November 21, 2016, Airplanes filed its answer and counterclaim. Dkt. 19. It took the position that the Reserve was properly classified. *Id.* It sought declaratory judgments that no event of default alleged by UMB had occurred and that the Indenture requires UMB to resume paying Airplanes's expenses. *Id.*

On December 9, 2016, Airplanes filed a motion for a preliminary injunction directing UMB to stop blocking Airplanes from paying expenses of it and its subsidiaries, Dkt. 22, as well as a supporting memorandum of law, Dkt. 23, a supporting declaration of William McCann, Dkt. 24, and a supporting declaration of Antonio Tavares Paes, Jr., Dkt. 25.

On December 12, 2016, UMB filed an answer to Airplanes's counterclaim. Dkt. 27.

---

[7] The April 12, 2017 letter stated that "the reduced Reserve reflects (a) Expenses of Airplanes Group and its subsidiaries that are already due and payable, but that UMB refuses to allow Airplanes Group to pay (such as fees due to the Canadian law firm that assisted in the 2016 sale of Airplanes Group's final aircraft, which brought approximately $40 million into Airplanes Group); (b) Expenses that Airplanes Group anticipates will become due and payable in future Interest Accrual Periods, as defined in the Indentures (including, as noted above, anticipated Expenses related to the Transbrasil Litigation); and (c) a 'Permitted Balance' of $10 million in respect of unanticipated Expenses." *Id.* at 3.

On December 22, 2016, UMB filed a motion for partial judgment on the pleadings, Dkt. 29, as well as a supporting memorandum of law, Dkt. 30 ("Pl. Br."), and a supporting declaration of Benjamin I. Finestone, Dkt. 31.

On December 23, 2016, UMB filed a response in opposition to the motion for a preliminary injunction. Dkt. 32.

On December 30, 2016, Airplanes filed a reply in further support of the motion for a preliminary injunction, Dkt. 35, and a supporting declaration of Stephen M. Sinaiko, Dkt. 37.

On January 23, 2017, Airplanes filed a motion for judgment on the pleadings, Dkt. 44, as well as a memorandum of law in support and in opposition to UMB's motion for partial judgment on the pleadings, Dkt. 47 ("Def. Br."), and supporting declarations of William M. McCann, Dkt. 45, and Stephen M. Sinaiko, Dkt. 46.

On January 30, 2017, UMB filed a reply in support of its motion for partial judgment on the pleadings. Dkt. 52.

On February 6, 2017, UMB filed a memorandum of law in opposition to Airplanes's motion for judgment on the pleadings. Dkt. 54 ("UMB Opp. Br.").

Also on February 6, 2017, the Court held argument on the pending motions.

On February 13, 2017, Airplanes filed a reply in support of its motion for judgment on the pleadings. Dkt. 57.

On March 8, 2017, the parties notified the Court that, after initial disputes, they had reached an agreement on terms under which UMB would permit the release of certain funds necessary for Airplanes to purchase director and officer liability insurance policies. Dkt. 64.

On April 7, 2017, Airplanes filed the April 7 Letter addressing the proposed reduction of the Reserve. Dkt. 66. On April 10, 2017, UMB filed a response, challenging Airplanes's right

to continue to reserve $46 million under the Indenture and calling the April 7 Letter "a tacit admission that the Reserve has been unlawful." Dkt. 67 (the "April 10 Letter"). On April 12, 2017, Airplanes responded to UMB's April 10 Letter. Dkt. 69 (the "April 12 Letter"). On April 13, 2017, UMB filed a letter with the Court stating that it would not respond to the April 12 Letter except to refer the Court to the case record "refuting each of Airplanes' numerous misstatements and mischaracterizations." Dkt. 70.

## II.   Applicable Legal Standards

### A.   Standards Governing Motions for Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings is governed by "the same standard" as a motion to dismiss under Rule 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam)); *accord L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). Thus, the Court accepts all of the non-movant's factual allegations as true and draws all reasonable inferences in the non-movant's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a motion for judgment on the pleadings, a party must plead sufficient factual allegations "to state a claim for relief that is plausible on its face," *id.* at 570, meaning that the complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "A grant of a motion pursuant to Rule 12(c) is proper 'if, from the pleadings, the moving party is entitled to judgment as a matter of law.'" *Dargahi v.*

12

*Honda Lease Trust*, 370 F. App'x. 172, 174 (2d Cir. 2010) (summary order) (quoting *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam)).

"On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" *L–7 Designs, Inc.*, 647 F.3d at 422 (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)). The Court may also review any document incorporated by reference in a pleading. *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). Finally, the Court may consider a document not specifically incorporated by reference but on which the complaint relies and which is integral to it. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

If the allegations of a pleading "are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994); *accord Feick v. Fleener*, 653 F.2d 69, 75 & n.4 (2d Cir. 1981). Thus, a motion for judgment on the pleadings "can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties." *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013).

**B.     Applicable Principles of Contract Law**

"It is a well-established rule in this Circuit that the interpretation of Indenture provisions is a matter of basic contract law." *Jamie Sec. Co. v. The Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989) (internal quotation marks and alterations omitted).

Here, the Indenture is to be construed under New York law. *See* Indenture, § 13.09. Under New York law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court. *See Provident Loan Soc'y of N.Y. v. 190 E. 72nd St. Corp.*, 911

N.Y.S.2d 308, 309 (1st Dep't 2010); *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451 (1983). So too is the determination whether a contract provision is ambiguous. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). A contract is ambiguous only if "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Goldman Sachs Grp., Inc. v. Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal citation and quotation marks omitted); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005). A contract is not ambiguous simply because the parties ask the Court to construe it differently. *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *Mt. Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (1996).

In determining the meaning of a contract, the Court "look[s] to all corners of the document rather than view sentences or clauses in isolation." *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation and internal quotation marks omitted); *see also Kass v. Kass*, 91 N.Y.2d 554, 566 (1998). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162. In other words, the Court's "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000).

Courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical. *See, e.g., Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 65 (2d Cir. 2010) ("declin[ing] to endorse" "interpretation of the Agreement [that] leads to an illogical result"); *Cole v. Macklowe*, 99 A.D.3d 595, 596 (1st Dep't 2012) ("[It is a] well settled principle

that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties."), *aff'd*, 125 A.D.3d 44, 999 N.Y.S.2d 403 (2014); *Matter of Lipper Holdings v. Trident Holdings*, 1 A.D.3d 170, 171 (1st Dep't 2003) (same); *see also Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (contracts should be examined "in light of the business purposes sought to be achieved by the parties") (citation omitted); *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 503 (1st Dep't 2012) ("It is a longstanding principle of New York law that a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided.") (collecting cases).

C.    **Standards Governing a Motion for a Preliminary Injunction**

To obtain a preliminary injunction in the Second Circuit, a party must demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

III.    **Discussion**

Three motions are currently pending. First, UMB seeks judgment on the pleadings on the issues of whether the Reserve has been properly classified, such that Airplanes may continue to withhold it from noteholders, and whether a payment default has occurred, which would render the note and guarantee thereof immediately due and payable. Second, Airplanes seeks judgment on the pleadings on these issues and the issue whether any event of default other than a payment default has occurred, including a judgment default and an unauthorized business default. Third,

Airplanes seeks a preliminary injunction directing UMB to stop preventing Airplanes from paying certain expenses. The Court addresses each issue in turn.

### A.    Classification of the Reserve

The parties dispute whether the Reserve has been properly classified under the Indenture as part of the "Required Expense Amount," and therefore properly given priority over payments on the notes. *See* FAC at ¶ 58; Indenture § 3.01(d).

As noted, the Indenture defines the Required Expense Amount as follows:

(i) the amount of Expenses of Airplanes Group due and payable on the Calculation Date relating to such Payment Date or reasonably anticipated to become due and payable before the end of the Interest Accrual Period beginning on such date,

(ii) at the discretion of the Cash Manager, an amount necessary to provide for Permitted Accruals . . . and

(iii) an amount determined by the Cash Manager to be necessary to maintain the Permitted Balance in the Expense Account after payment of the Expenses (on such Payment Date and during the next succeeding Interest Accrual Period) and provision for the Permitted Accruals.

Indenture § 1.01. And it defines a Permitted Accrual as a "balance containing accruals in respect of Expenses that are not regular, monthly recurring Expenses . . . of Airplanes Group *anticipated to become due and payable* in any future Interest Accrual Period," Indenture § 3.01(d) (emphasis added), and defines "Expenses" as "any *fees, costs or expenses incurred* by an Airplanes Group Member in the course of the *business activities permitted* under Section 5.02(e) of the Indenture," *id.* § 1.01 (emphasis added).

UMB argues that Airplanes has wrongly classified the Reserve for two independent reasons: because (1) the Transbrasil judgment is not "anticipated to become due and payable"; and (2) the Transbrasil liability is not an "Expense" under the Indenture in that it is not (a) a "fee, cost, or expense incurred," and (b) incurred in the course of a permitted business activity. *Id.* ¶¶

16

61–70. UMB further argues that Airplanes's claim to the contrary is commercially unreasonable because (a) the parties would not have intended unsecured creditors like Transbrasil to be paid ahead of secured creditors like the noteholders, and (b) any intercompany obligation that Airplanes Limited might owe to Airplanes Holdings to cover the Transbrasil judgment would be recouped against the $4 billion that Airplanes Holdings still owes to Airplanes Limited on intercompany loans. *Id.* ¶ 77.

For the reasons that follow, the Court holds that the Reserve, to the extent it contains funds reserved to account for potential liability arising from the Transbrasil litigation, contains funds that are not properly classified as part of the Required Expense Amount.

### 1. "Anticipated to Become Due and Payable"

For the Reserve to fall under within the Required Expense Amount as defined, the funds in it must fit within one of the three alternative parts of that definition. The first and second require that funds therein be "due and payable" or "anticipated to become due and payable" at finite times. Indenture §§ 1.01, 3.01(d). It is disputed that liability to Transbrasil is not currently due and payable. *See* Pl. Br. at 24; Def. Br. at 24. On the contrary: As Airplanes admits, the Brazilian judgment against Airplanes Holdings has been reversed, and the orders to pay have been cancelled and not reinstated. *See* Airplanes Ans. ¶ 41. The operative question is therefore whether liability to Transbrasil is "anticipated to become due and payable."

The parties dispute whether the word "anticipate" requires a degree of certainty. Both cite dictionary definitions. UMB notes that Merriam-Webster defines "anticipate" in part as "to look forward to *as certain*: expect," Pl. Br. at 24 (citing Merriam-Webster.com, accessed Nov. 25, 2016 at https://www.merriam-webster.com/dictionary/anticipate) (emphasis in Pl. Br.), and that American Heritage Dictionary defines it in part to mean "[t]o see as a *probable* occurrence;

17

*expect*," Pl. Br. at 24 (citing American Heritage Dictionary (5th ed. 2016)) (emphasis in Pl. Br.).

In contrast, Airplanes notes that the Merriam-Webster definition also includes "to give advance

thought, discussion, or treatment to" and "to foresee and deal with in advance: forestall," Def.

Br. at 24 (citing Dkt. 46, Ex. 5),[8] and that the McMillan Dictionary definition includes "to guess

that something will happen, and be ready to deal with it," Def. Br. at 24 (citing Dkt. 46, Ex. 7).

The assembled case law points to a middle ground, in which, for liability to Transbrasil to

be "anticipated," liability need not be certain, but it must be more than speculative, conjectural,

or hypothetical. Courts analyzing the meaning of "anticipate" in different contexts have found

that the plain or common definition of the word requires, at a minimum, at least some degree of

probability that extends beyond hypothetical possibility—that is, a degree of likelihood that

gives rise to a reasonable expectation.

In *SN Sands Corp. v. City & Cty. of San Francisco*, for example, the California Court of

Appeal applied a provision of a city charter requiring the city's board of supervisors to approve

contracts with "anticipated expenditures" in excess of $10 million. 167 Cal. App. 4th 185, 187

(2008). The court held that "determination of . . . 'anticipated expenditures' must be based on

more than the mere possibility of incurring an expenditure." *Id.* at 193 (citing dictionary

definitions of "anticipated" as "to look forward to as certain" and "[a]pprehended beforehand,

looked for, expected").

Similarly, in *Cyze v. Banta Corp.*, the district court for the Northern District of Illinois

interpreted an employment contract that required an employer to provide severance benefits if an

---

[8] The full definition of "anticipate" in the Merriam-Webster online dictionary is: (1) "to give advance thought, discussion, or treatment to;" (2) "to meet (an obligation) before a due date;" (3) "to foresee and deal with in advance; forestall;" (4) "to use or expend in advance of actual possession;" (5) "to act before (another) often so as to check or counter;" and (6) "to look forward to as certain; expect." Dkt. 46, Ex. 5.

employee was terminated, *inter alia*, "in anticipation of" a change in control of the company. No. 07 C 2357, 2009 WL 2905595, at *3 (N.D. Ill. Sept. 8, 2009). The court concluded that the provision regarding severance benefits applied only if the employer "kn[e]w of an impending, rather than speculative, change in control." *Id.* at *6. In reaching this result, the court examined a series of Webster's dictionary definitions. It found that "[t]he connotation implicit in each of these definitions requires a knowledge of a certain future event and not *mere speculation* about a possible event." *Id.* at *3 (emphasis added); *see id.* ("To act in anticipation of something requires an awareness of a future event and a preparation for it."); *see also Al-Kasid v. L-3 Commc'ns Corp.*, No. 12-12948, 2013 WL 1688851, at *7 (E.D. Mich. Apr. 18, 2013) (after reviewing a series of definition listed in Merriam-Webster online dictionary to determine the "plain meaning" of the term "anticipated," court finds, in context of an independent contractor agreement, that it was "more reasonable to interpret the term 'anticipate' as meaning 'looking forward to as certain' or 'expect'").

These cases definitively reject Airplanes's notion that an "anticipated" liability can be one based on mere possibility or speculation. And the term "anticipate" as used in the Indenture is not accompanied by qualifying language (*e.g.*, a preceding adjective) that would change this meaning so as to permit a future event to be held "anticipated" based on a conjectural projection or theoretical possibility. In light of the requirement of some solid basis for deeming a future expense "anticipated," the Court is compelled to hold that Airplanes's liability to Transbrasil is insufficiently probable to qualify as "anticipated." On the contrary, such liability is quite unlikely: As the situation stands, the earlier judgment against Airplanes Holding has been reversed, the orders to pay have been cancelled, and the reversal has been upheld so as to withstand Transbrasil's November 2016 challenge.

To be sure, Transbrasil remains in the process of challenging the November 23, 2016,

decision by the Brazilian court of appeals declining to hear Transbrasil's appeal of the October

2013 Reversal. As noted, Transbrasil has filed a "motion for clarification," asking the Brazilian

court of appeals to reconsider and reverse its decision; this motion is still *sub judice*. *See* Dkt. 66

at 2. Airplanes, however, supplies no well-founded basis to expect that court to reverse itself.

Assuming the appellate ruling remains intact, Transbrasil may then appeal to Brazil's supreme

court. But on the record at hand, there is no reason to project that such an appeal would lead to

review on the merits, let alone to reversal. Counsel for Airplanes conceded at argument: "I don't

think anybody's saying there is a high probability of the supreme court of Brazil granting review

here." Tr. at 67. Counsel at argument did not dispute the broad analogy to the likelihood that a

petition for certiorari before the United States Supreme Court would eventually yield a reversal.

*See* Tr. at 12–15.[9] It is not an answer for Airplanes to conclusorily dub the Brazilian legal

system "unpredictable." *See* Tr. at 61. And Airplanes agrees with UMB that, on the merits,

Transbrasil's judicially rejected claims against it were plainly legally deficient. *See* Airplanes

Ans. ¶ 2 ("[T]he claims Transbrasil has asserted against [Airplanes] Holdings in the Transbrasil

Litigation lack merit, fairness or rationale . . . ."). Finally, Airplanes's own characterizations of

the Transbrasil liability in this litigation belie that it truly anticipates such liability, as opposed to

viewing an adverse judgment as theoretically possible. *See* Airplanes Ans. ¶ 128 (liability to

Transbrasil "highly uncertain"); *id.* ¶ 159 (liability to Transbrasil "possible"); Def. Br. at 8

(liability to Transbrasil "remains possible"); Tr. at 61 ("[h]ard to say" how probable liability to

Transbrasil might be because Brazil's legal system is "unpredictable").

---

[9] At argument, Airplanes, for the first time raised the general possibility that a claim could newly
be pursued in a Brazilian trial court that could somehow lead to liability against it. Tr. at 69–70.
This Court rejects this scenario as unsubstantiated conjecture.

Significantly, too, in its post-argument letters, Airplanes has repudiated its earlier claim that its $190 million reflected a reasonably anticipated amount of liability to Transbrasil. It now proposes a reduction to $46 million. *See* Dkts. 66, 69. Yet Airplanes offers no support for its earlier tabulation, or any coherent explanation why a $46 million adverse judgment is now reasonably "anticipated." Airplanes appears instead to hope that dropping its reserve by three-quarters may present as less unreasonable. Perhaps so—but the pertinent issue is whether liability in the amount of the new figure is fairly anticipated. Airplanes adduces no factual basis for that claim.

Finally, as to the third part of the definition of Required Expense Amount, Airplanes does not argue that the $190 million Reserve, or even the reduced Reserve of $46 million that it now proposes, meets that definition. Nor could it: The permitted balance for the third category is expressly capped at $10 million. *See* Indenture § 3.01(d) (permitting Airplanes to maintain "a balance not to exceed at any time $10,000,000 to pay unanticipated Expenses").

Accordingly, the Court finds that Airplanes has misclassified the funds in the Reserve set aside to reflect potential liability in the Transbrasil litigation.

### 2. Expense

Having found that the Reserve improper because the amounts that Airplanes has reserved and that it proposes to reserve to reflect its liability to Transbrasil are not "anticipated" within the meaning of the Indenture, the Court need not reach UMB's alternative argument: that the Reserve is unjustified because any liability to Transbrasil would not be an "Expense" under the Indenture. Even if liability to Transbrasil were held an "Expense," the Reserve would not satisfy any part of the definition of a Required Expense Amount.

### B. Events of Default

UMB also asks the Court to find the misclassification of the funds in the Reserve has resulted in an event of default under Section 4.01(c) of the Indenture (a "Payment Default").[10] The Court so finds.

Section 4.01(c) provides that the following constitutes an event of default under the Indenture:

> failure to pay any amount (other than interest) when due and payable in connection with any note, to the extent that there are, at such time, funds available for such payment in the Collection Account, and the continuance of such default for a period of two Business Days or more . . . .

Indenture § 4.01(c). Under the Indenture, "[i]f an Event of Default . . . occurs and is continuing," and if the Senior Trustee has properly given notice of default, the "Outstanding Principal Balance and all accrued and unpaid interest thereon shall be due and payable" upon delivery of the default notice, *id.* § 4.01(a), which in turn renders Airplanes U.S. Trust's guarantee immediately due and payable, *id.* § 12.01. Those conditions are met here. The Reserve contains—and it long has contained—"funds available" for payments on the Subclass A-9 note. And Airplanes's continuing misclassification of those funds has resulted in a wrongful withholding of those funds for far longer than two business days. DBTCA, UMB's predecessor, delivered notices of default accelerating the Subclass A-9 note on June 28, 2016, and July 29, 2016. FAC ¶¶ 88-89. Accordingly, the Court finds, a Payment Default has necessarily occurred. This, in turn, accelerates the Subclass A-9 note under the Indenture and renders all accrued and

---

[10] The FAC alleges three events of default: (1) a "Payment Default" as a result of misclassification of the Reserve and associated suspension of payments on the Subclass A-9 note; (2) a "Judgment Default" as a result of the entry of the Transbrasil Judgment against Airplanes Holdings; and (3) an "Unauthorized Business Activity Default" as a result of the involvement of Airplanes Limited in the Transbrasil lawsuit through its agent GECAS. FAC ¶¶ 83–87, 90–91.

unpaid interest and all principal outstanding on the note, as well as Airplanes U.S. Trust's guarantee of the note, immediately due and payable. *See* Indenture §§ 4.02(a); 12.01.

In its cross-motion, Airplanes seeks judgment on the premise that no event of default has occurred—it denies that a Payment Default, a judgment default, and an unauthorized business activity default has occurred. The Court denies Airplanes's cross-motion based on its finding of a Payment Default. The Court has no occasion to consider whether any other type of default has also occurred.

### C.    Other Justifications for Reserve

The Court therefore holds that Airplanes has improperly reserved funds on account of an imagined Transbrasil liability, because this liability is not "anticipated" within the meaning of the Indenture. Airplanes therefore was and is not permitted to suspend payments to noteholders on account of the need to maintain a Reserve on this basis. The Court further holds that Airplanes's misclassifications of these funds have resulted in an event of default.

This ruling does not, however, definitively resolve whether the entirety of the $190 million reserved must now be distributed to noteholders. Conceivably, portions of the funds reserved may be properly reserved on other grounds. The Indenture does permit, for example, reserving of up to a $10 million balance for unanticipated expenses. The parties, however, have not briefed whether alternate justifications may exist for any part of the funds in the Reserve. UMB's written submissions instead repeatedly refer to the propriety of the Reserve as a whole, on the tacit premise, it appears, that Airplanes's only claimed justification for any part of the reserve is based on the Transbrasil liability. *See* Pl. Br. at 16 ("UMB Bank seeks a judgment that the Reserve does not fall within the 'Required Expense Amount' under the plain language of the

Indenture."); UMB Opp. Br. at 3 (alleging that Airplanes "reserved $190 million based upon the [Transbrasil] judgment and the orders [to pay]").

Airplanes, in contrast, alludes to possible other bases for some part of a reserve. It states that the Reserve "is not exclusively in respect of the potential or contingent liability in the Transbrasil litigation," and that Airplanes in reserving has not only "take[n] into account the contingent liabilities of Airplanes Holdings and Transbrasil" but has also sought to "mak[e] sure that Airplanes Group has the money it needs to complete its winding up, and there actually are quite a number of different aspects." Tr. at 50; *see also* Airplanes Ans. ¶ 160 (Airplanes has "taken steps to maintain cash reserves that . . . are sufficient to permit the payment of, *among other things*, any [Transbrasil] judgment" (emphasis added)); *id.* ¶ 161 ("Wholly apart from assessments of the likely magnitude of Holdings' liability in the Transbrasil Litigation, ongoing sales of aircraft in the Airplanes Group portfolio have affected the necessary level of Airplanes Group's cash reserves."). Airplanes's alternative justifications, however, have been couched in vague and conclusory terms. Most recently, in its April 7 Letter, Dkt. 66, Airplanes declared that that $9 million of the $46 million in the proposed reserve as reduced would relate to the Transbrasil litigation and that the proposed reduced Reserve would "include a $10 million Permitted Balance" for unanticipated expenses. But it did not explain the basis on which the remaining $27 million was properly withheld. *Id.* at 2. And its April 12 Letter provided only hazy justifications as to the $27 million, stating that the reduced Reserve would encompass due and payable expenses, and expenses anticipated to become due and payable. No specifics were offered: The April 12 Letter contained no examples of anticipated expenses and only one of a due and payable expense: "fees due to the Canadian law firm that assisted in the 2016 sale of Airplanes Group's final aircraft." Dkt. 69 at 2–3.

To enable the Court to resolve this inadequately briefed and fact-intensive issue, the Court directs counsel for Airplanes, within two weeks of this decision, to file a sworn declaration with the Court setting in detail the factual quantitative basis for funds, if any, that Airplanes believes may properly be retained in the Reserve for purposes unrelated to the Transbrasil liability. Airplanes is to attach documentation supporting any such purportedly proper reserve. It is also to state specifically when Airplanes first determined that each basis for a reserve, in the amount identified, was justified. Airplanes is invited to submit a brief memorandum of law explaining why each amount for which it proposes to reserve is justified under the Indenture. UMB's response will be due one week later. To the extent, if any, that Airplanes proposes to justify a reserve based on a previously unarticulated ground, the parties' memorandum should address whether Airplanes has waived the right to pursue a reserve on such ground. The Court invites counsel, prior to Airplanes's submission on this point, to meet and confer, with the goal of finding common ground on this issue and obviating the need for continued litigation.

### D.  Preliminary Injunction

Airplanes also seeks a preliminary injunction directing UMB "to stop blocking defendants . . . from paying their own and their subsidiaries critical expenses." Dkt. 23 at 4. It claims that its unpaid "critical expenses" exceed $1.5 million. *Id.* at 19. It seeks "the unimpeded ability to pay only those expenses necessary to keep its directors, controlling trustees and outside professionals in place, and keep [Airplanes] and its subsidiaries in compliance with applicable law, while this litigation is pending." *Id.* at 5.

Airplanes provides the following examples as "critical expenses" that UMB refuses to pay: (1) compensation for Airplanes Limited's directors and Airplanes U.S. Trust's controlling trustees, (2) liability insurance coverage for its directors and officers ("D&O coverage"); (3)

payments to law firms that advise Airplanes on Irish, Jersey, and New York law, (4) payments beyond an $125,000 "cap[]" to Airplanes's counsel in relation to this action, (5) fees due to Airplanes's cash manager and administrative agents, (6) fees due on behalf of Airplanes Holdings to its counsel in the Transbrasil action, and (7) fees due to a Canadian law firm that assisted Airplanes's subsidiaries in selling aircraft. *Id.* at 4–5, 18.

As noted above, in March 2017, following completion of briefing on the instant motion, after initially disagreeing about D&O coverage, *see* Dkts. 61–62, the parties were able to reach an agreement under which UMB would permit the payment of Airplanes's D&O coverage for the following year, *see* Dkt. 64. The Court understands that aspect of Airplanes's motion to have been mooted, at least for this calendar year.

As to the remaining issues raised in the motion for a preliminary injunction, the Court's judgment is that Airplanes has not made a sufficiently concrete showing to enable the Court to determine how much money, if any, is properly paid in the various categories Airplanes recites. The Court is prepared to conclude that there be a valid basis for Airplanes to expend funds in some of these areas, *i.e.*, to make limited payments to its directors, controlling trustees, and legal counsel to compensate them for their services as necessary to wind up Airplanes's affairs. Even if there is no longer a basis for a continued Reserve, the Court respects that some limited infrastructure may need to remain in place, for example, to effect the distribution of that Reserve to noteholders, and to pay counsel responsible for necessary legal filings in this action as directed by this opinion and order. However, the Court is mindful that Airplanes no longer has any airplanes, and that its writ of valid work has narrowed markedly. UMB is therefore rightly concerned about the potential for excessive, and unreasonable, payments to Airplanes's directors,

trustees, and counsel. Such excessive payments would unfairly deprive noteholders of money due them.

The Court therefore will deny Airplanes's motion for a preliminary injunction, because it has not convincingly substantiated the need for such relief. This ruling, however, is without prejudice to Airplanes's right to pursue such a injunction in the future, if the parties cannot resolve these issues collegially. The Court, however, is optimistic that counsel can reach agreement, much as they resolved the issues relating to D&O coverage. The Court expects that, with the guidance offered by this opinion, thoughtful counsel for UMB and Airplanes ought to be able to agree on reasonable expenditures that Airplanes can make, for example, to assure that compensation is paid to the professionals assisting it for services necessary to conduct and wind up Airplanes's affairs. To this end, the Court directs that counsel for UMB and Airplanes meet, within two weeks of this decision, to seek to reach agreement as to the limited expenditures that Airplanes may properly make consistent with its limited present charter. Counsel are to notify the Court, by joint letter due within four weeks of this opinion and order, of the results of these discussions.

## CONCLUSION

For the foregoing reasons, the Court (1) grants UMB's motion for partial judgment on the pleadings insofar as it seeks findings that the Reserve has been misclassified and that an event of default has occurred; (2) denies Airplanes's motion for judgment on the pleadings; and (3) denies Airplanes's motion for a preliminary injunction.

The Court has also set forth herein deadlines for submissions relating to potential alternative justifications for the Reserve and relating to permissible expenditures by UMB. The

27

Court understands that the parties are attempting to resolve this matter, and will be receptive to a joint application for a reasonable extension of these deadlines.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 22, 29, and 44.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 26, 2017
New York, New York